DIANA GROTE, Plaintiff-Appellant, v. ESTATE OF MARGARET FRANKLIN, Defendant-Appellee.

Second District   No. 2—90—1015

Opinion filed June 5, 1991.

Robert M. Foote, of Murphy, Hupp, Foote, Mielke & Kinnally, of Aurora (Craig S. Mielke, of counsel), for appellant.

Michael C. O'Neill, of Law Offices of John R. Wienold, Ltd., of Aurora (John R. Wienold, of counsel), for appellee.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, Diana E. Grote, filed a complaint against defendant, the estate of Margaret S. Franklin, alleging that Margaret (the decedent) negligently operated her motor vehicle, causing the decedent to cross the center line and hit plaintiff's vehicle head-on. Defendant filed an affirmative defense alleging that an "Act of God" was the sole or proximate cause of the accident. Defendant then moved for summary

judgment on its affirmative defense, which the trial court granted. Plaintiff timely appeals, raising the following issues: (1) whether the trial court properly considered expert opinions in granting summary judgment, and (2) whether, as a matter of law, an "Act of God" was the sole proximate cause of the motor vehicle accident involving plaintiff and the decedent. We affirm.

The accident at issue occurred on March 14, 1989, at approximately 12:25 p.m. in Kane County, Illinois. According to the traffic accident report prepared by police officer David Reese, plaintiff's vehicle was traveling northbound on Route 25 prior to the accident, and the decedent's vehicle was traveling southbound on Route 25. The impact between the two vehicles took place in the northbound lane of Route 25.

Michael Henningson saw the decedent's vehicle prior to the accident. According to his statement, Henningson was traveling southbound a few vehicles behind the decedent. The decedent was traveling at a very slow rate of speed, and several vehicles that were following her had passed her. Henningson stated that he witnessed the decedent's vehicle cross the yellow center line into oncoming northbound traffic. A northbound Yugo came to a complete stop in the northbound lane. The decedent's vehicle struck the Yugo and then veered back into the southbound lane. Henningson could not tell whether the decedent's return to the southbound lane was a conscious steering effort or whether it was from the impact of hitting the Yugo.

Henningson stated that the decedent's vehicle continued traveling at a slow rate of speed for another 75 to 80 yards before it veered over into the northbound lane again. Henningson reported that the decedent's vehicle went up on the side of the road and knocked over a mailbox. It was headed for a "Welcome to St. Charles" sign when it took a definite maneuver towards going back on the road. The decedent's vehicle accelerated up to a much greater rate of speed and veered back over into the correct southbound lane. There was then a curve in the road, and the decedent's vehicle was out of Henningson's sight. When Henningson completed the curve, he saw that the decedent's vehicle had collided with the plaintiff's.

Sue Anderson stated that she was traveling northbound on Route 25 on the day in question. Anderson stated that the two vehicles traveling in front of her had pulled off to the side of the road, which caused her to pull over. Anderson then saw the decedent's southbound vehicle coming into the northbound lane. Anderson explained that the decedent's vehicle was traveling at a slow rate of speed. After the decedent's vehicle passed her, Anderson looked in her rearview mirror

and saw that the decedent's vehicle was completely in the wrong lane. Anderson then saw the decedent's vehicle go off the road and hit a mailbox. Anderson stated that when the vehicle hit the mailbox, the driver was sitting upright, and Anderson could see the back of the person's head. Anderson said that after hitting the mailbox, the decedent's vehicle then started back across the roadway.

William Durrenberger also saw the decedent's vehicle prior to the accident at issue. According to the statement given by Durrenberger, he was a passenger in a car which was traveling northbound on Route 25. Durrenberger said he first saw the decedent's vehicle when it was one-fourth to one-half mile away. He said it soon became apparent that the decedent's vehicle was in the wrong lane of traffic and was traveling approximately 40 to 60 miles per hour. Durrenberger told his friend, the driver of the vehicle in which he was riding, to honk the horn, which the driver did. Durrenberger stated that the decedent's vehicle did not react to them; instead, it maintained its rate of speed and continued as if it were supposed to be in the wrong lane. Durrenberger stated that the decedent's vehicle was able to negotiate a slight bend in the road.

Durrenberger said that his friend slowed their car down to 5 to 15 miles per hour and pulled the car half way up onto the curb. After the decedent's car passed them, Durrenberger's friend looked in his rear-view mirror and saw that there had been an accident. They turned their car around to go to the scene of the accident. Durrenberger stated that, when they arrived at the scene, he went to the decedent's vehicle to see if there was anything he could do. The decedent had slid down underneath the steering column and her head was lying on the passenger seat looking up towards the ceiling. While Durrenberger stated that there was no indication that the decedent was still conscious, he said that her eyes were open and her lips were "kind of quivering a little bit." Durrenberger opined that the decedent must have hit something with her face because there was blood on her face and one of her eyes had been "pounded pretty bad."

Terry Heiland witnessed the decedent's vehicle strike the plaintiff's. According to his statement, Heiland noticed the decedent's vehicle when he first turned onto the southbound lane of Route 25. Heiland saw the decedent's vehicle about one-fourth to one-half mile behind him traveling about five miles per hour. The vehicle was on the west side of Route 25, off the road and into the grassy area. Heiland said that he saw the vehicle drive over a mailbox. Heiland proceeded southbound around a curve in the road and lost sight of the decedent's vehicle. Subsequently, Heiland saw the decedent's vehicle in his

rearview mirror as it was coming around the curve. Heiland stated that the vehicle appeared to be in control and was traveling south at approximately 30 miles per hour in the northbound lane. Heiland turned off Route 25 and into a driveway. When he looked up, he saw the decedent's vehicle strike the plaintiff's. Heiland stated that he did not hear either vehicle use its brakes. Heiland said that he went over to the decedent's vehicle and saw her lying down behind the steering wheel; the decedent had blood on the bridge of her nose.

In a statement given by Jeffrey Lewis Finley, an off-duty police officer, Finley indicated that, in the afternoon on the date of the subject accident, it was cloudy but dry and the temperature was in the 40's. Finley stated that he was traveling north on Route 25, heading toward St. Charles. Finley explained that Route 25 is a two-lane highway, with one lane of traffic in each direction and a marked center line.

Finley stated that he observed the decedent's car traveling southbound in the northbound lane of Route 25 around a slight curve in the road. Finley said that, when he realized that the vehicle was not going to switch into the correct lane, he pulled his vehicle off the roadway and let the decedent's vehicle pass him. Finley said that he was able to see the decedent as her car went by and described her as an elderly, gray-haired woman that appeared to be lifeless. He said that the decedent was crouched down, hanging on to the top of the steering wheel. Her skin was colorless, and he saw no movement in the car. He said that she had a blank stare in her eyes, which were pointed elsewhere besides on the road. Finley opined that it looked like the decedent was passed out behind the wheel.

Finley stated that when the decedent's vehicle passed him, it was traveling approximately 50 miles per hour. He said the vehicle continued southbound in the wrong lane, causing two cars behind him to pull off the road. Finley had a portable radio in his vehicle and reported the incident. He then proceeded after the decedent's car, around a slight curve in the road. By the time Finley drove around the curve, the decedent's vehicle had already collided with the plaintiff's vehicle. Finley called in the accident on the radio and then went over to check on the decedent. Finley stated that he saw no signs of life: the decedent had no pulse, and she did not move.

When questioned as to whether the decedent's vehicle was traveling in a straight line, Finley responded:

> "No, it's a curved section of the roadway and as I think back the only way that that vehicle could have done what it did, drove the way it was would be if the wheels were like con-

stantly touching the curb and the curb kept pushing it back on the roadway or something because it was just, probably if a person had been driving the vehicle they probably couldn't have negotiated the arc in that curve as perfectly as that car, as [the decedent's] car appeared to be doing."

Finley explained that the day after the accident, he went back to look at the curb. He stated that there were black marks on the east side of the curb, indicating that a tire had been scuffing up against it. Finley opined that it was probably from the decedent's vehicle, although he admitted that he did not examine the decedent's tires after the accident.

Dr. James Pritchard is the pathologist who performed the autopsy on the decedent. In his deposition, Pritchard testified that, prior to performing the autopsy, he spoke with the decedent's attending physician, Dr. Nelson. Pritchard was informed that the decedent had seen Nelson in the past for some episodes of what were thought to be transient ischemia. Pritchard explained that transient ischemia are episodes where the brain does not receive a sufficient amount of oxygen and the patient can become disoriented or faint. Pritchard testified that he was not able to determine, from the autopsy, or any other source, whether the decedent had an episode of transient ischemia on the day she died.

The autopsy showed that there had been trauma to the upper part of the decedent's body in the frontal area. In addition, there had been trauma to the chest area and a large amount of blood was discovered in the middle part of the decedent's chest. Pritchard stated that the blood in the chest resulted from a laceration in the aorta. Pritchard explained that the laceration was typical of a blunt trauma in a forward motion and opined that the car accident was the cause of the tear.

Pritchard found it significant that the heart did not show any congenital anomalies, and the calcifications present in the decedent's aorta were consistent with her age. Pritchard stated that, to the best of his knowledge, the decedent did not have a heart attack.

The autopsy showed a large amount of blood found in the decedent's brain. The bleeding in that area came from the basilar artery. Pritchard could not say for certain what caused the damage to the basilar artery; however, he opined that it was not necessarily related to the trauma that caused the aorta to rupture. In support, Pritchard stated that the basilar artery is extremely well protected and it would be unusual for it to be damaged by trauma.

Pritchard opined that the basilar area was damaged prior to the aorta tearing. His opinion was based, in part, upon a statement regarding the facts of the auto accident provided by Dr. Pritchard's chief medical technologist,. who happened to witness the decedent driving just prior to the accident. The technologist told Pritchard that she saw the decedent cross over into the wrong lane of traffic, cross back into the right lane, and then cross over again into oncoming traffic. Pritchard opined that the bleeding from the basilar artery caused the aberrations in driving to occur, and the proximate cause of the decedent's death was the blunt trauma sustained at the time of the impact of the accident.

Pritchard was unable to find what caused the bleeding in the basilar artery. Pritchard stated that it could not be determined exactly when the bleeding started; however, he did estimate that it started within six to eight hours of the decedent's death. Pritchard explained that a massive hemorrhage to the basilar artery would cause a person to lose voluntary control of his or her reactive systems. Pritchard stated that such a hemorrhage would prevent a person from being able to respond to outside stimulus. A person stricken with this type of hemorrhage has no warning as to when it will occur. Pritchard explained that there is usually a pain of varying severity in the back, and one loses consciousness rather quickly.

Dr. Rodney Nelson is an internist and cardiologist. The decedent had been a patient of Nelson's for approximately 20 years. Nelson recalled having seen the decedent on November 18, 1988, at which time the decedent reported an episode of confusion. Although it is not in his records, Nelson believes that he probably told the decedent not to drive for one month. Nelson testified that the next time he saw the decedent was on February 23, 1989. Nelson stated that the decedent's condition on that day was "really excellent." Nelson read his notes from that visit into the record. Nelson noted a history of ischemic attack, which both he and the decedent felt was most likely the cause of her period of confusion in the previous November. Nelson noted no returns of confusion; however, the decedent was directed to take aspirin every other day for cerebral ischemic episodes. Nelson stated that such episodes would likely be associated with confusion in someone of the decedent's age, who was 78 years old.

Nelson discussed the decedent's death with Dr. Pritchard. Nelson opined that the cause of death was a rupture of the aorta. The decedent also had an intracranial bleeding episode from the basilar artery. Based upon a hearsay report of the accident and the information provided by Dr. Pritchard, Nelson opined that the cerebral hemorrhage

caused the decedent to lose consciousness and, perhaps, to lose control of her car. Nelson conceded, however, that it was not possible to determine for certain whether the bleeding occurred before or after the accident.

Nelson opined that in March 1989, the decedent was competent to drive a vehicle. Nelson explained that a single episode of confusion in an otherwise apparently healthy person, such as the decedent, would not merit the recommendation that the person permanently abstain from driving.

Nelson testified that generally when an ischemic attack occurs, there is no warning to the patient that the attack is coming. Nelson stated that such an attack impairs a person's judgment, performance, and so forth. Similarly, an intracranial bleeding episode causes a person to lose control of his or her senses and ability to reason. The bleeding episodes prevent a person from using independent judgment in his or her bodily action, as it commonly causes prompt and total loss of consciousness.

Defendant's counsel posed Dr. Nelson with the following hypothetical:

"I would like you to assume for purposes of my question the following facts, along with your knowledge of [the decedent], your discussion with the pathologist and, also, your knowledge of the physical condition that she was found to be in at the autopsy; okay?

I want you to assume the following facts in addition to that: That [the decedent] was driving her automobile; and within a couple blocks of where the accident happened, she was observed as driving erratically, and by that I mean knocked over a mailbox, ran into parked cars; assume, also, that she failed to respond in an appropriate way, meaning stopping her automobile or taking other evasive action once she had encountered those problems; also assume that she failed to respond to an outside stimulus, such as someone blowing a horn, and that she continued on in an erratic path, which she was doing.

I want you to also assume that an independent observer within a couple blocks of the accident actually visualized [the decedent] and described her appearance as being passed out, although, with her eyes open and being somewhat slumped over her steering wheel, although, having her hands on the steering wheel.

I, also, want you to assume that the independent observer described her as being real pale, lifeless, no expression and no

color at the time that he observed her as she was going past him prior to the accident.

With these assumptions, Dr. Nelson, along with your knowledge of the medical history of [the decedent] and the conditions as described to you by the pathologist and your own findings, do you have any opinion as to whether [the decedent] was suffering from either a transient ischemic attack or intracranial bleeding prior to the accident?"

Over the objection of plaintiff's counsel, Nelson answered by stating:

"Ischemia comes in radiance from mild to moderate to—when it gets beyond that point, we have irreversible changes with tissue damage due to the level of ischemia.

With this sequence of events, this would put this at a level more than a transient ischemic attack."

Nelson opined that an intracranial hemorrhage is consistent with the assumptions presented in the hypothetical and the physical findings of the decedent. Nelson testified that he knew of no other medical reason that would explain the decedent's behavior.

Nelson conceded that someone could not negotiate a curve while driving a car without purposeful bodily function. However, Nelson would not find it unusual for a person without purposeful bodily function to retain his or her hands in their appropriate position on the steering wheel. Nelson explained that in such a situation a person's hands can either become placid, in which case everything drops, or they can become spastic, in which case they would retain a very tight grip on the wheel. Nelson testified that, after death, there is no way to determine whether a person was placid or spastic.

After due consideration, the trial court granted defendant's motion for summary judgment and entered judgment in favor of defendant and against plaintiff. Plaintiff timely appeals.

■ First, we consider plaintiff's contention that the trial court improperly considered the opinion testimony of Dr. Pritchard and Dr. Nelson. Plaintiff initially argues, without citation to authority, that summary judgment should generally not be granted based upon expert testimony. Plaintiff's argument is clearly a misstatement of the law. In fact, the same argument was made in *Harris v. Bethlehem Steel Corp.* (1984), 124 Ill. App. 3d 449, and was rejected.

In *Harris*, the plaintiff asserted that summary judgment could not be based on the opinion of an expert witness adduced at a deposition. The plaintiff claimed that, because a jury is not bound to accept the opinion of an expert on an ultimate issue, such an opinion is too

inconclusive to form the basis of a summary judgment. (*Harris*, 124 Ill. App. 3d at 453.) The appellate court disagreed, finding that "the issue in summary judgment cases is not whether a jury would accept or reject the statement of the affiant or deponent but rather whether that statement is contradicted so as to create a genuine issue of material fact." (*Harris*, 124 Ill. App. 3d at 453.) The court held that, because the expert's deposition was uncontradicted and the plaintiff had not argued that the expert was incompetent to testify, the trial court could properly consider the expert's opinion in ruling on the motion for summary judgment. *Harris*, 124 Ill. App. 3d at 453.

Similarly, plaintiff has not argued here that Dr. Pritchard or Dr. Nelson was incompetent to testify. Nor were their testimonies contradicted. Plaintiff presented no expert testimony in her behalf, and the testimony presented by her witnesses was undisputed. The extent to which the facts are inconsistent with the experts' opinions affects only the weight to be given to the opinions, not their admissibility. *Saunders v. Norfolk & Western Ry. Co.* (1977), 54 Ill. App. 3d 307, 316.

Plaintiff makes other arguments in attacking the admissibility of the experts' opinions; however, she cites no authority in support of her arguments. Arguments made without citation to authority do not merit review. *City of Chicago v. Cross City Disposal, Inc.* (1990), 200 Ill. App. 3d 520, 524.

Next, we consider plaintiff's argument that summary judgment was improperly granted because there were unresolved factual issues. Specifically, plaintiff argues that a question of fact remains as to whether the decedent was stricken with an unforeseeable sudden illness, which rendered her incapable of controlling her vehicle.

When a plaintiff appeals from a trial court's order granting summary judgment for a defendant, the only issue on appeal is whether "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c); *West v. Kirkham* (1991), 207 Ill. App. 3d 954, 957.) In determining whether a genuine issue of fact exists, the trial court must construe the pleadings, depositions, and affidavits in the light most favorable to the nonmoving party. (*Wilmere v. Stibolt* (1987), 152 Ill. App. 3d 642, 646.) Where the evidence before the court shows that a verdict would have to be directed at trial, entry of summary judgment is proper. *West*, 207 Ill. App. 3d at 957-58.

■ If a plaintiff shows that an accident occurred as a result of the defendant driving on the wrong side of a road, then a *prima facie* case of negligence has been made. (*Osborne v. O'Brien* (1986), 114 Ill. 2d 35, 41.) "It is then incumbent on the defendant to adduce evidence to show that his vehicle was in that position because of some reason other than his own negligence." (*Osborne*, 114 Ill. 2d at 41.) An unforeseeable sudden illness which renders a defendant incapable of controlling his vehicle is an "Act of God" and can preclude tort liability for a resulting collision. *Burns v. Grezeka* (1987), 155 Ill. App. 3d 294, 299.

■ Plaintiff contends that an affirmative defense based upon an "Act of God" cannot be the basis for a summary judgment. We disagree and find the cases cited by plaintiff to be distinguishable. In *Baltes v. Checker Taxi Co.* (1960), 27 Ill. App. 2d 298, the trial court excluded any testimony that the accident was caused by a sudden heart attack suffered by the driver. The jury returned a verdict in favor of the plaintiff, and the defendant appealed. The appellate court reversed, finding that the evidence supporting the defendant's theory that the accident occurred solely because of a heart seizure suffered by the driver was admissible. (*Baltes*, 27 Ill. App. 2d at 301.) However, the appellate court rejected the defendant's argument that evidence of the driver's heart seizure requires a judgment in its favor. The court stated: "We are satisfied that the testimony viewed in its aspect most favorable to the plaintiff presented a case which should go to the jury for a verdict." (*Baltes*, 27 Ill. App. 2d at 302.) The opinion does not set forth the testimony on which the court relied. In any event, we do not interpret the court's statement as precluding summary judgment in all cases where an "Act of God" defense is used.

*Hoggatt v. Melin* (1961), 29 Ill. App. 2d 23, and *McClean v. Chicago Great Western Ry. Co.* (1954), 3 Ill. App. 2d 235, are similarly distinguishable. In *Hoggatt*, the appellate court declined to reverse the jury's finding that the accident at issue was caused by an Act of God. (*Hoggatt*, 29 Ill. App. 2d at 29.) In *McClean*, the appellate court found that a jury instruction defining "Act of God" was warranted in that case. (*McClean*, 3 Ill. App. 2d at 246-47.) The *McClean* court noted that when the driver's wheels went off the road, he was slumped over the steering wheel with his right hand on the steering wheel, his left hand hanging at his side, and his head bent forward to a position almost level with the upper part of his chest. In addition, there was testimony that the driver's vehicle was out of control and that the driver appeared to have had a stroke or attack, or was reaching slowly for

something. The court stated: "It was for the jury to determine from the facts he observed and stated whether [the driver] had an attack of illness." *McClean,* 3 Ill. App. 2d at 246.

We do not find the court's rulings in *Hoggatt* or *McClean* as barring summary judgment in the case at bar. The only case cited by plaintiff which is at all similar to the present case is *Burns v. Grezeka* (1987), 155 Ill. App. 3d 294.

In *Burns,* the plaintiff was a passenger in a vehicle that was stopped at a red light when it was struck in the rear by a car driven by the defendant. The defendant subsequently died, and the plaintiff amended her complaint, naming decedent's estate as a defendant.

The driver of the car in which the plaintiff was traveling stated in his deposition that he first observed the decedent 10 or 15 seconds after the accident and noted that his eyes were open, but rolled back, and his arms were up; shortly thereafter, the decedent was unconscious and drooling, with his eyes closed and his arms down. When the plaintiff saw the decedent, the decedent was gasping for air, was unconscious, and his skin was a grayish-blue color. *Burns,* 155 Ill. App. 3d at 296.

A doctor examined the decedent shortly after the accident. According to the doctor's deposition, the decedent told him he was driving his car when he suddenly became weak and passed out. The doctor explained that the decedent was suffering from an abdominal aneurysm which had been present for the past two or three years and had spontaneously ruptured. The doctor stated that the rupture had caused the decedent's blood pressure to drop and rendered him unconscious 45 to 60 seconds afterwards. The doctor opined that it was most probable that the aneurysm had preceded and caused the accident. The doctor stated that the decedent would not have experienced any forewarning of the rupture. *Burns,* 155 Ill. App. 3d at 296-97.

In response to the defendant's motion for summary judgment, the plaintiff filed additional excerpts from the doctor's deposition and a police report; both indicated that the decedent had fainted while at the red light. In addition, the doctor stated in the filed excerpts that, based upon a reasonable degree of medical certainty, it was possible that the accident had preceded and caused the rupture. *Burns,* 155 Ill. App. 3d at 297.

The trial court granted the defendant's motion for summary judgment, and the appellate court reversed. The court found that the evidence did not demonstrate as a matter of law that the rupture of the aneurysm caused the accident. The court noted that the doctor's testimony was contradictory and did not establish the disputed question as

to when the rupture occurred. The court also noted that the decedent could be considered negligent for driving in an impaired state of health or for failing to pull his vehicle over to the side of the road in the 45 to 60 seconds before the rupture rendered him unconscious. *Burns*, 155 Ill. App. 3d at 299.

As with the other cases cited by plaintiff, we do not find the court's opinion in *Burns* as precluding summary judgment when an "Act of God" defense is raised. Further, we find the facts in *Burns* to be distinguishable from the case at bar. While the opinion of the doctor in *Burns* was contradictory, the experts' opinions in the present case were consistent. Dr. Pritchard opined that the decedent suffered from a massive cerebral hemorrhage of the basilar artery which preceded the trauma of the auto accident and caused her to lose control of her vehicle. Dr. Nelson opined that the decedent suffered from a sudden intracranial hemorrhage, which caused the decedent to lose consciousness and, perhaps, to lose control of her car. Nelson opined that the cause of death was a rupture of the aorta.

■■ Plaintiff has filed no deposition refuting the opinions of Drs. Pritchard and Nelson. While Dr. Pritchard was unable to determine for certain whether the decedent had an episode of transient ischemia on the day she died, Dr. Nelson opined that the decedent did not have a transient ischemia attack. He opined that the only medical explanation for the decedent's behavior was that she suffered from an intracranial hemorrhage.

Plaintiff has presented nothing which would put the above opinions into question. The statements given by the witnesses did not contradict the experts' opinions. While witnesses saw the decedent's vehicle hit a mailbox, veer back into the correct lane, and cross over again into oncoming traffic, there is nothing to suggest that the decedent's actions were deliberate or purposeful. In fact, witnesses commented on decedent's lack of reaction.

Jeffrey Finley saw the decedent as she passed him, and he said that she appeared to be lifeless. She was crouched down, hanging onto the top of the steering wheel; her skin was colorless and she had a blank stare in her eyes. He opined that it looked like she was passed out behind the wheel. After Finley saw the state of decedent's condition, he witnessed her vehicle negotiate a curve in the road. Finley stated that the only way the vehicle could have negotiated the curve the way it did was if the wheels were constantly touching the curb and the curb kept pushing it back on the roadway. This is consistent with the experts' opinions, which indicated that a massive hemor-

rhage to the basilar artery would cause a person to lose voluntary control of his or her reactive systems.

Further, unlike *Burns*, there is no evidence here that the decedent was negligent for driving in an impaired state of health. The decedent apparently only had one episode of transient ischemia, which was in 1988. Approximately one month prior to the accident, the decedent met with her doctor, who reported her to be in excellent health. In addition, the doctor opined that the decedent was competent to drive on the date of the accident.

There is also no evidence suggesting that the decedent was negligent for failing to pull her vehicle over to the side of the road after the hemorrhage began. In *Burns*, there was expert testimony indicating that, once the aneurysm ruptured in the defendant driver, he probably suffered increased back pain and had 45 to 60 seconds before he was rendered unconscious. In the case at bar, there was testimony indicating that a person stricken with a cerebral hemorrhage has no warning as to when it will occur. While Dr. Pritchard testified that the hemorrhage most likely occurred within six to eight hours of the decedent's death, he explained that it takes a while for the pressure to increase because the bleeding can begin with small oozing and start and stop. He stated that the hemorrhage itself comes quickly and, while there is pain of varying severity in the back, one loses consciousness rather quickly.

There was nothing to suggest in the case at bar that the decedent felt the back pain or had time to pull off the road. Thus, we find that, as a matter of law, the decedent was not negligent and the accident was caused by an Act of God.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.