**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190340-U

Order filed July 22, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| WILLIAM S. MOSSHOLDER, Administrator of the Estate of Alice Mossholder, | ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0340 Circuit No. 15-L-200 |
| STEVE STALTER, Administrator of the Estate of Norbert J. Stalter, | ) ) ) ) | Honorable Michael P. McCuskey, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justices Holdridge and Wright concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: (1) Admission of testimony of decedent's spouse, in action against decedent's estate, did not violate Dead-Man's Act where spouse's testimony involved facts that occurred prior to the accident that caused plaintiff's death.
(2) Trial court did not abuse its discretion in allowing expert witness to testify where his reliance on information from decedent's spouse was the type of information customarily relied on by physicians in diagnosing and treating patients.
(3) Plaintiff's motion for judgment *n.o.v.* or, alternatively, a new trial was properly denied.

¶ 2    Plaintiff, William Mossholder, administrator of the estate of Alice Mossholder, filed a wrongful death complaint against Norbert Stalter, alleging that Norbert was negligent when he ran a red light and struck Alice's vehicle.[1] Prior to trial, plaintiff filed a motion to bar defendant's expert witness, which the trial court denied. The jury returned a verdict in favor of defendant, and the trial court denied plaintiff's motion for judgment notwithstanding the verdict (judgment *n.o.v.*) or, in the alternative, a new trial. Plaintiff appeals, claiming the trial court erred in (1) allowing Norbert's wife to testify in violation of the Dead-Man's Act (735 ILCS 5/8-201 (West 2018)), (2) refusing to bar the testimony of defendant's medical expert, and (3) denying his posttrial motion. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    Around 6:15 p.m. on September 16, 2015, Alice Mossholder was driving westbound on Lake Avenue in Peoria, Illinois. As she attempted to turn left onto University Street, Norbert Stalter ran a red light and struck the driver's side of her van. Alice died at the scene. Emergency responders transported Norbert to the hospital, where he died six weeks later.

¶ 5    Mossholder, Alice's husband, filed a wrongful death suit as the administrator of Alice's estate, alleging that Norbert's negligence in failing to stop at the intersection caused Alice's death. In response, defendant Steve Stalter, acting as administrator of Norbert's estate, raised an "act of God" affirmative defense and asserted that Norbert suffered a sudden and unexpected seizure shortly before the collision.

¶ 6    Prior to trial, defendant disclosed a controlled expert witness, neurologist Dr. Morris Fisher, who would provide his medical opinion that defendant suffered a seizure at the time of the accident. Prior to Dr. Fisher's deposition, Mossholder filed a motion seeking to bar his testimony.

---

[1] Norbert passed away shortly after Mossholder filed the complaint. The court appointed Norbert's son, Steve Stalter, as administrator of Norbert's estate and replaced him as the named defendant in this case.

2

Mossholder argued that he should not be allowed to base his opinion that Norbert suffered a seizure on Mary's observations of Norbert moments before the accident. Following a hearing, the court denied plaintiff's motion. The court noted that Dr. Fisher's evidence deposition had not been taken and, if it was later determined that the witness had improperly relied on Mary's testimony, the court would entertain a motion at that time.. Dr. Fisher's evidence deposition was subsequently conducted. Mossholder did not object to Fisher's opinions during the deposition and did not object at trial when the deposition testimony was presented.

¶ 7        At trial, Richard Schraeder testified that he witnessed the collision. Schraeder was in his vehicle traveling northbound on University Street. As he approached the intersection at Lake and University, the light turned red and he began to slow down. At that point, he noticed a pickup truck in the lane next to him driving past his vehicle. The truck entered the intersection on a red light without braking and struck a minivan. Schraeder testified that the driver of the minivan was turning left from Lake onto University. Schraeder did not see the truck swerve, leave its lane, or otherwise attempt to avoid the collision. After witnessing the accident, Schraeder exited his vehicle and ran to Norbert's truck. Schraeder testified that "some people were trying to talk to him and he was just sitting in the pickup truck. I didn't know if he was in shock or – like I say, he was pretty unresponsive."

¶ 8        Officer Jared Moore responded to the accident at 6:19 p.m. It was daytime and the conditions were clear. He was unable to speak with Alice, but Norbert told him that "he did not remember what happened." Norbert's wife, Mary, was a passenger in the vehicle with her husband at the time of the accident. When Moore arrived on the scene, Mary was standing at the truck, outside the passenger door. He asked her what happened and she stated that "[Norbert] was accelerating and he wasn't stopping." She told Moore that Norbert was not responding to her.

Awhile later, Moore spoke with Mary again in the ambulance. She told him that as they were driving, Norbert had "a blank look about him." When Moore asked her about the crash, she said that "he didn't swerve, didn't react to it."

¶ 9    The next day, Moore went to the hospital and was informed that Norbert was in a medically induced coma and was unable to give a statement. While he was there, Moore had a brief conversation with Mary. She said that she and Norbert were going to get something to eat. As they were driving, they talked and Norbert acted normal; he was not complaining about anything. While they drove northbound on University, Norbert sat up in the middle of the driver's seat. He had a "washed look on his face" and a "very tight grip on the steering wheel." Mary explained that somewhere between War Memorial and Lake Avenue, Norbert began to accelerate. As they approached the intersection of University and Lake, the light turned red. Mary told Norbert to slow down. There was no response so she yelled at him to slow down, and there was still no reaction.

¶ 10   Moore also spoke with the trauma physicians that cared for Norbert immediately after the accident. According to their statements and medical records, they found no evidence of a stroke or heart attack.

¶ 11   Mary testified to the jury by way of a prerecorded evidence deposition. She stated that on the day of the accident, she and Norbert were headed out for dinner. After he made the turn onto University, it seemed to her that he "took off." Norbert appeared white and he was driving fast. Mary tried to stop him, but he did not respond. She testified that his eyes looked strange. He "didn't blink or nothing, and just was straight ahead. He didn't see or hear anything I said, I don't think." As Norbert approached the intersection of University and Lake, he was "going very fast." Mary estimated that they were traveling 50 miles per hour. She kept telling him to stop, but "it was like it never registered." She noticed that his hands were clutching the steering wheel and his skin was

4

white. She testified that Norbert had never suffered a similar episode or had any other issues while driving.

¶ 12    On cross-examination, Mary stated that she believed her husband was in good health except for high blood pressure. When asked about Norbert's general health, she had difficultly remembering his diagnosed health conditions, including atrial fibrillation, fainting, fatigue, sleep apnea, shortness of breath and edema.

¶ 13    Dr. Stephen Hippler, Norbert's primary care physician, testified on behalf of the defense. He had been treating Norbert since 2002. Norbert had a wellness appointment with him in July, two months before the accident. Norbert reported that he was "feeling not too bad." He did not complain of any issues such as fatigue, seizures, or loss of consciousness while driving.

¶ 14    Dr. Hippler also assessed Norbert's chronic problems at the appointment in July, including shortness of breath, fluid overload, cardiomegaly, sleep apnea, bilateral edema, and gout. When asked about prior medical conditions, Dr. Hippler opined that Norbert did not have any condition that he believed should have prevented him from driving that day.

¶ 15    Dr. Hippler testified that, in general, it was possible for a person to experience a seizure by suffering a sudden loss of consciousness, regaining consciousness, and subsequently showing no signs that a seizure occurred. He also testified that a person who had a blank look, a washed out face, a tight grip on the steering wheel, and did not respond to other people was consistent with a person who was suffering from "a seizure or cardiac arrhythmia." Dr. Hippler stated that the description did not sound like someone who had fallen asleep.

¶ 16    Dr. Fisher is a board-certified neurologist who graduated from Harvard Medical School and has been practicing in Chicago since 1975. He reviewed Norbert's emergency room medical

records from the hospital following the accident and the medical records from Dr. Hippler. The emergency room records he reviewed stated the following:

> "[p]atient was restrained driver of a truck that was traveling towards an intersection that had a red light. When patient's wife asked him if he was going to stop, patient did not respond and, according to his wife, was staring straight ahead looking zoned out."

He also reviewed Officer Moore's police report, which indicated a similar condition of nonresponsiveness.

¶ 17        Dr. Fisher opined that that Norbert had a number of medical problems, but none of them were a contraindication of driving. He believed that the cause of Norbert's sudden condition while driving that day was the result of a seizure. He testified that the sudden onset and nonresponsiveness indicated in the police report supported his conclusion.

¶ 18        He also testified that Norbert's medical records provided two medical conditions that could have caused the seizure: (1) ischemic changes in Norbert's brain, and (2) atrial fibrillation. He explained that Norbert's atrial fibrillation was the most "obvious" cause of the seizure. He described that such a condition is "very frequently" associated with clots in the heart that break off and then travel to the brain. They cause injury by cutting off oxygen to that portion of the brain. He stated that those type of seizures are typically "very brief" because the clot dissolves and then the blood flows again. The patient may therefore suffer a brief event, followed by a partial or complete recovery. He opined that Norbert probably suffered a complex partial seizure, concluding "I think it's unequivocal that he had a seizure—I don't know anything else that could cause what happened here." Dr. Fisher stated that, in his medical opinion, Norbert suffered an unexpected

6

seizure on the date of the accident and that he had no reason to expect he would suffer such an event while driving.

¶ 19   Dr. Fisher further explained that there is no medical test that can document a seizure after it happens. The best manner of determine the diagnosis is the history of the patient. In evaluating or diagnosing the cause of a stroke or seizure, treating physicians ordinarily rely on information provided by witnesses to the seizure. He testified that the most immediate observations are part of the history of the case and are important considerations in diagnosing an event. In this case, the history given to the police officer and the information provided to the hospital by Mary were "a very important part" in diagnosing the event because they were the most immediate observations.

¶ 20   The jury returned a verdict in favor of defendant, and the trial court denied plaintiff's posttrial motion for judgment *n.o.v.* or, in the alternative, for a new trial.

¶ 21                                    II. ANALYSIS

¶ 22                          A. Mary's Occurrence Testimony

¶ 23   Plaintiff first contends that Mary's testimony regarding her observations of Norbert immediately before the accident should have been barred by the Dead-Man's Act (735 ILCS 5/8-201 (West 2018)). Plaintiff claims that, as Norbert's spouse, Mary is a person directly interested in the action and therefore incompetent to testify under the Act.

¶ 24   By failing to object to Mary's testimony at trial, plaintiff has forfeited review of the issue on appeal. See *McMath v. Katholi*, 191 Ill. 2d 251, 256 (2000); *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 71 (failure to renew an objection at trial results in forfeiture of the ability to challenge consideration of the evidence on appeal).

¶ 25   Even if we did not consider forfeiture, plaintiff's argument that the Dead-Man's Act precluded admission of Mary's testimony is unpersuasive. The Dead-Man's Act provides:

"In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***." 735 ILCS 5/8-201 (West 2018).

The primary objective of the Dead-Man's Act is fairness. *Balma v. Henry*, 404 Ill. App. 3d 233, 238 (2010). It is intended to remove the temptation of a survivor to testify about matters that cannot be rebutted because of the death of the only other party to the conversation or witness to the event. *Id.* Thus, the Dead-Man's Act bars only that evidence the decedent could have refuted. *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005). Stated differently, evidence of facts that the decedent could not have refuted is not rendered inadmissible by the Dead-Man's Act. See *Rerack v. Lally*, 241 Ill. App. 3d 692, 695 (1992). In the context of automobile accidents, it is generally understood that "the event" is the collision itself. *State Farm Mutual Automobile Ins. Co. v. Plough*, 2017 IL App (2d) 160307, ¶ 10.

¶ 26    In *Rerack*, the decedent's vehicle struck the back of the plaintiff's car, which had come to a stop. *Rerack*, 241 Ill. App. 3d at 693. The proffered testimony related to the plaintiff's perceptions and the mechanical condition of his car prior to impact. The trial court barred the plaintiff from testifying on the basis that his testimony related to the event at issue, *i.e.* the accident. On review, the appellate court held that the trial court properly barred the plaintiff from testifying regarding the details of the collision itself but that the court's application of the Dead-Man's Act was overly broad. *Id.* at 695. The reviewing court held that the plaintiff could properly testify regarding the mechanical condition of his own automobile, the functioning of his brake light, the weather conditions at the time of the accident, the placement of his foot on the brake pedal and the

8

duration of his stop. The court concluded that the plaintiff's testimony was admissible because it was not "regarding an occurrence which took place in the 'presence' of the decedent." *Id.*

¶ 27 Here, as in *Rerack*, the "event which took place in the presence of the deceased" was the accident itself. However, Norbert's actions while driving the truck can be considered only as happenings or occurrences which *did not* take place in the presence of Alice, who was occupying a different vehicle. Alice had no personal knowledge regarding Norbert's physical condition moments before impact or whether he was suffering a seizure as he drove through the red light. She never could have testified in that regard. Therefore, we find that, absent evidence establishing that Alice observed Norbert and could have testified to his physical awareness immediately before impact, Mary's prerecorded testimony was properly admitted. Her testimony is not precluded because it pertained to the period, however brief, before the collision, and it could not have been refuted by Alice.

¶ 28 B. Dr. Fisher's Expert Testimony

¶ 29 Next, plaintiff argues that the trial court erred in admitting Dr. Fisher's testimony because his opinion inappropriately relied on Mary's statements as to Norbert's physical condition as he approached the intersection.

¶ 30 Decisions of whether to admit expert testimony are within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Id.*

¶ 31 Illinois Rules of Evidence Rule 703 governs the acceptable basis for expert witness testimony and states:

9

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703 (eff. Jan. 1, 2011).

The primary focus in applying Rule 703 is "whether the information upon which the expert bases his [or her] opinion is of a type that is reliable." *Wilson v. Clark*, 84 Ill. 2d 186, 193 (1981). Rule 703 recognizes that expert testimony may be based on other testimony or facts not in evidence. *Id.* Even a non-treating expert may testify based on facts not in evidence so long as experts in that field would reasonably rely on such information to reach their conclusions. *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51. Reliable information may be provided by a third party if it is helpful in forming a medical diagnosis. See *Barker v. Eagle Food Centers, Inc.*, 261 Ill. App. 3d 1068, 1073 (1994) (statements made by a person with an interest in the well-being of a patient are reliable); see also *Becherer v. Best*, 74 Ill. App. 2d 174, 182 (1966) (a physician may rely on information obtained from both the patient and outside sources).

¶ 32        In this case, Mary provided statements to Officer Moore at the scene moments after the accident and later, in the hospital, within hours of the collision. She also gave information to the emergency trauma physicians that assisted the medical team in assessing the health and condition of her husband. Specifically, she provided facts regarding Norbert's condition moments before the collision, described his physical state as he approached the intersection, noted his failure to respond to her plea to stop, and provided a detailed description of his unresponsive appearance. Dr. Fisher testified that the information Mary provided was critical and that neurologists ordinary rely on such information to diagnose and treat a patient, particularly when patients suffer a seizure and are

10

unable to assess their condition. Given Norbert's inability to communicate, Dr. Fisher properly relied on other sources to determine the medical history of his condition, including statements from Mary. Moreover, evidence at trial established that consideration of statements from someone who observed the medical event is a practice commonly relied on by physicians in reaching their conclusion that a patient suffered a seizure. And plaintiff presented no evidence to demonstrate that the information Mary provided was unreliable. Thus, the trial court did not abuse it's discretion in admitting Dr. Fisher's testimony.

¶ 33                    C. Plaintiff's Motion for Judgment *N.O.V.* or a New Trial

¶ 34        Last, plaintiff contends that the trial court erred in denying his motion for judgment *n.o.v.* or, alternatively, a new trial. In considering such motions, the trial court cannot reweigh the evidence and set aside a verdict just because the jury could have drawn different inferences or conclusions or because the court feels that other results are more reasonable. *Maple v. Gustafson,* 151 Ill. 2d 445, 452 (1992). Likewise, we cannot usurp the function of the jury and substitute our own judgment for theirs. Id.

¶ 35        We review *de novo* a trial court's denial of a motion for a directed verdict or judgment *n.o.v. Jackson v. Seib,* 372 Ill. App. 3d 1061, 1068 (2007) Judgment *n.o.v.* is properly entered where all the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand. *Maple*, 151 Ill. 2d at 453. In ruling on a motion for judgment *n.o.v.,* the court does not weigh the evidence, nor is it concerned with the credibility of the witnesses. *Id.* Instead, the court may only consider the evidence, and any rational inferences therefrom, in the light most favorable to the nonmoving party. *Id.* A trial court has no right to enter a judgment *n.o.v.* if there is any evidence demonstrating a substantial factual dispute or where the assessment of the witnesses'

11

credibility or the determination regarding conflicting evidence is decisive to the outcome at the trial. *Id.* at 454.

¶ 36    Alternatively, on a motion for a new trial, a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Id.* A verdict is against the manifest weight of the evidence where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based on the evidence. *Id.* We will not reverse a trial court's ruling on a motion for a new trial unless it is affirmatively shown that the court clearly abused its discretion because the trial judge had the benefit of observing the witnesses firsthand at the trial. *Id.* at 455. In determining whether the trial court abused its discretion, we must consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. *Id.*

¶ 37    Here, the jury's findings were not unreasonable, arbitrary, or not based on the evidence. Plaintiff filed a negligence claim against defendant alleging that Norbert fell asleep at the wheel of his vehicle and struck Alice's van. In response, defendant claimed the affirmative defense of "an Act of God," and claimed that Norbert suffered a sudden, unforeseen medical emergency that caused him to drive through the red light. See *Grote v. Estate of Franklin*, 214 Ill. App. 3d 261, 271 (1991) (Act of God defense may be used to overcome a claim of automobile negligence when an unforeseen medical event causes a loss of vehicular control). At trial, the jury heard testimony regarding the collision itself and Norbert's unresponsive condition as he approached the intersection moments before the collision occurred. It also heard testimony from Norbert's primary care physician and from an expert witness, who both opined that Norbert suffered a sudden, unanticipated seizure. Dr. Fisher testified that typically, seizures that result from atrial fibrillation are sudden and last only moments but cause the patient to be unresponsive for the duration of the

12

event. In his opinion, it was "clear" that Norbert suffered a seizure that caused him to run a red light and crash into Alice's minivan. No other medical expert testified to dispute Dr. Fisher's testimony. Thus, there was ample evidence to support the conclusion that Norbert suffered a sudden and unexpected medical emergency.

¶ 38     In this case, the jury was asked to weigh the evidence before it and it competently did so. It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide the weight to be given to the witnesses' testimony. See *Maple,* 151 Ill. 2d at 452. Although plaintiff disagrees with the jury's verdict, we cannot say that its decision was against the manifest weight of the evidence. For these reasons, we conclude that the trial court did not err in denying plaintiff's request for judgment *n.o.v.* or a new trial.

¶ 39                                        III. CONCLUSION

¶ 40     The judgment of the circuit court of Peoria County is affirmed.

¶ 41     Affirmed.