LARSON, Respondent v. SYVERSON, Appellant

(166 N.W.2d 424)

(File No. 10528. Opinion filed April 1, 1969)

**May, Boe & Johnson** and **Gale E. Fisher,** Sioux Falls, for defendant and appellant.

**Lawrence L. Piersol,** of **Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for plaintiff and respondent.

HOMEYER, Judge.

This is an action to recover a real estate broker's commission alleged to be due plaintiff, Warren L. Larson, for procuring a purchaser for two unimproved lots within the city limits of Sioux Falls formerly owned by the defendant, Ray G. Syverson, Sr. Trial to the court resulted in a judgment for plaintiff in the amount of $1500 and the defendant appeals.

The principal assignment of error and the only one requiring discussion challenges the sufficiency of the evidence to support the court's findings. Citations are unnecessary to support the elementary rule that the credibility of the witnesses and weight to be accorded their testimony is for the trial court and we accept that version of the evidence including any reasonable inferences therefrom which are favorable to the trial court's determination. As a reviewing court we will disturb the findings of fact only when it appears that they are contrary to a clear preponderance of the evidence. We approach the question presented in that perspective.

On or about August 30, 1966, Syverson listed the lots and some other real estate with Larson for the purpose of finding a buyer. The parties concede there was no exclusive listing. The sale price of the individual lots was shown. The price of one lot was $20,000 and the other $10,000. Between that date and March 27, 1967, Larson showed the lots on several different occasions to S. F. Pecaut of Sioux City, Iowa. Pecaut was an officer and the principal stockholder of Pecaut Equipment Company and Pecaut Realty Company, both family corporations, with businesses at Sioux City and Sioux Falls.

On March 27th Larson by telephone discussed the purchase of the lots with Pecaut who first offered $25,000, but when Larson told him the minimum price was $30,000, he agreed to pay that sum. Larson and Pecaut had had a number of prior business dealings and Pecaut authorized Larson to sign such documents and advance such sums of money as might be necessary to consummate the transaction.

On the same date, Iris Boyd, an employee of Larson who had procured the listing, telephoned Syverson and asked if the lots were still for sale. Syverson said that they were and she was told that he had sold three other lots contained in the listing and she noted the lots sold and the name of the purchaser on a plat attached to the listing. Syverson also stated that he preferred to sell the two lots as a unit. Still on the same date Larson went to Syverson's place of business with a written offer on one of Larson's "Earnest Money Contract" forms which proposed that Pecaut would purchase the lots for $30,000 in cash. Syverson read the proposal and then stated that he wanted $10,000 down and the rest "on amortizing". Larson said "Well, possibly that can be arranged."

Larson returned to his office and in a telephone conversation confirmed that Pecaut would deal for the lots on the new terms. He prepared a second "Ernest Money Contract" dated March 28, 1967 and it was shown to Syverson at about 2 p. m. on that day. Syverson at that time informed Larson that he

was attempting to sell the lots to another party and that he would call him thereon the next day. On March 29th Larson accompanied by Mrs. Boyd again called on Syverson and he again stated he wanted more time before signing and he would call the following day. On March 30th Syverson informed Larson in a telephone conversation that "We've decided that we're going to sell these (lots) to somebody else."

The record reveals that a check for $10,000 dated March 29, 1967, marked as a down payment for the lots was issued by H. S. Price to Syverson and not cashed. A second check for $8700 dated March 30, 1967 and deposited on April 3, 1967, in lieu thereof, passed between the same parties and a Contract for Deed dated April 1, 1967 and recorded on April 11, 1967 was executed. The sale consideration was shown as $30,000 with a down payment of $8700. There was testimony by Syverson that he and his son had been negotiating with Price on the sale of the lots before the Pecaut offer was presented, but it is undisputed that the sale had not been "firmed up" or completed before Mrs. Boyd's telephone call and Larson's presentation of Pecaut's proposal to buy for the listed price of $30,000 in cash.

 A broker effecting a sale of property can recover a commission only by virtue of the contract with his principal, either express or implied. Thus, when he is employed to find a purchaser, the broker earns his commission and becomes entitled thereto when he produces a purchaser who is ready, able, and willing to purchase at a price and upon the terms specified by the principal or satisfactory to him. Stablein v. Hutterische Gemeinde, 43 S.D. 54, 177 N.W. 810; Ericson v. Ebsen, 52 S.D. 97, 216 N.W. 860; Dobson v. Wolff, 74 S.D. 493, 54 N.W.2d 469. Generally, a refusal of the principal to complete the sale does not deprive the broker of his right to compensation. Rossum v. Wick, 74 S.D. 554, 56 N.W.2d 770. It is not necessary to bring the principal and the purchaser face to face, and it is sufficient if the principal has been notified that the purchaser has been found and afforded a full opportunity to make a binding contract, but refuses to do so without just reason or excuse thereby repudiating the agreement with his agent and breaking the

contract of employment. Kaercher v. Schee, 189 Minn. 272, 249 N.W. 180; 12 C.J.S. Brokers § 95. See also Gumo v. Lind, 219 Minn. 438, 18 N.W.2d 125.

The writer in the text, Corbin on Contracts, § 50, p. 199, in discussing contracts of this nature says: "The most commonly recurring case is one in which the owner employs a broker to find a purchaser able and willing to buy, on terms stated in advance by the owner, and in which the owner promises to pay a specified commission for the service. This is an offer by the owner, the broker's power of acceptance to be exercised by the actual rendition of the requested service. Here the only contemplated contract between the owner and the broker is a unilateral contract—a promise to pay a commission for the services rendered. Cases are very numerous in which the owner, after the broker has fully performed the requested service, fails to make conveyance to the purchaser and refuses to pay the commission. Such a refusal is not the revocation of an offer; it is the breach of the fully consummated unilateral contract to pay for services rendered. If the requested service is merely the production of a purchaser able and willing to buy on definitely stated terms, the broker has a right to his commission even though the owner at once refuses to accept the purchaser's offer."

██ Syverson's testimony indicates that since he did not give Larson an exclusive listing, and a sale with Pecaut was not completed, he felt he owed no commission. This is not the law. We deem it of no significance that the written proposal listed Pecaut Realty Company as the actual purchaser. The record amply supports that the purchaser, be it Pecaut or his company, was able and willing to purchase at the price and upon the terms specified in the contract of employment. In fact this was not advanced as a reason for refusing to sell and it is clear that the subsequent sale to Price was for the same price and upon terms which were satisfactory to Pecaut. In our opinion the record shows no just reason or excuse for not selling to Pecaut. Admittedly, Syverson had the right not to sell to the purchaser produced and revoke the agency, but such revoca-

tion does not change or affect the liability which has arisen prior to revocation. As stated in Beck v. Howard, 43 S.D. 179, 178 N.W. 579, "where the broker had theretofore fully complied with the terms and conditions of his employment he would be entitled to recover such commission or compensation as therein provided, regardless of such revocation." In Beck there was an exclusive listing, but this dissimilarity does not make the rule inapplicable.

There is some conflict between the parties as to what the understanding was with reference to the employment and what transpired at the times mentioned supra. Suffice it to say that these conflicts were resolved by the trial court and in our opinion the evidence is sufficient to sustain its findings.

■ Minor discrepancies between portions of plaintiff's proof and the court's findings have been called to our attention. Such as there may be in our opinion did not affect the substantial rights of the parties and may be disregarded. RCP 61, Harmless Error. Plank v. Heirigs, 83 S.D. 173, 156 N.W.2d 193.

Affirmed.

All the Judges concur.