2000 SD 9

**In the Matter of the ESTATE OF Gilbert DOKKEN, Deceased.**

**No. 20856.**

Supreme Court of South Dakota.

Argued Oct. 20, 1999.

Decided Jan. 19, 2000.

Reed C. Richards of Richards and Richards, Deadwood, South Dakota, Attorneys for appellant Lee Thomas.

Keith R. Smit and Candi Thomson, The Morman Law Firm, Sturgis, South Dakota, Attorneys for appellee Estate.

GILBERTSON, Justice.

[¶ 1.] Lee Thomas (Thomas), contestant, appeals the trial court's order admitting his great-uncle's last will and testament to probate and denying his objections. We affirm.

## FACTS

[¶ 2.] Gilbert Dokken (Dokken) died August 23, 1997 at the age of 82. He was survived by his sister, Myrtle Cross (Myrtle) and his grandnephew, Thomas.

[¶ 3.] Dokken was born on October 17, 1915 in North Dakota. He worked on his father's farm near Towner, North Dakota until he entered the army, where he was educated as an aircraft armorer. Dokken was honorably discharged as a corporal from the Army in 1945 at which time he returned to the Towner area. In 1948, Dokken was diagnosed with dementia praecox paranoid type, and was placed under the care of the Veterans Administration at its Fort Meade Hospital. In addition to the dementia praecox, in 1956 Dokken was diagnosed with schizophrenia. At this time, the Department of Veterans Affairs (VA) determined Dokken to be incompetent for VA purposes.

[¶ 4.] From 1948 until his death, Dokken spent many years both in institutional and residential supervised care. In 1967 Dokken's brother, Melvin Dokken, was appointed his VA guardian in North Dakota. In 1972 Dokken was placed in foster home care near Spearfish, South Dakota under the Community Home Care Program of Fort Meade. He remained at the foster home until his death. From 1978 through November of 1985, the foster home was owned and operated by Douglas and Mickaela Hyde.

[¶ 5.] From the late 1970s until Dokken's death, VA social workers visited with him and other VA officials made yearly field examinations of his mental and financial status. Dokken suffered primarily the negative symptoms of schizophrenia evidenced by social isolation, limited interpersonal relationships, and withdrawal. He often refused to converse with or answer questions from people he did not know and trust. Although quiet by nature and because of his mental status, he would readily converse in a responsive manner with those he knew well and trusted, such as the Hydes and the other veterans who resided at the Hyde home. He readily kept up on the events of the outside world by frequent watching of television and regularly reading newspapers and magazines.

[¶ 6.] Dokken's brother Melvin passed away in 1981. On December 2, 1982, Dokken's brother-in-law, Kenneth Cross (Kenneth), was appointed VA guardian in South Dakota. Kenneth remained Dokken's guardian until 1988 when First Bank of South Dakota was appointed as successor guardian.

[¶ 7.] In late 1984 or early 1985, Dokken told the Hydes he wished to go to his hometown of Towner, North Dakota, to view the family farm and to have the Dokken family attorney, Joseph McIntee (McIntee), make his will. The Hydes

promptly relayed this request to the Crosses. There was a substantial delay in complying with Dokken's wishes until July 1985 when the Crosses arrived at Spearfish from their home in Washington for their annual visit with Dokken. The Crosses drove Dokken to Towner and on July 12, 1985, McIntee drafted and Dokken executed, Dokken's last will and testament.

[¶ 8.] Dokken's will left his entire estate of over $400,000 to Myrtle.[1] If Dokken's will had not been executed, contestant Thomas would have inherited one-half of Dokken's estate by intestate succession. Thomas objected to the will claiming Dokken lacked the testamentary capacity to execute it. Thomas also claimed undue influence was exerted upon Dokken by the Crosses. The trial court found insufficient evidence to establish lack of testamentary capacity or undue influence. Finally, Thomas objected to the testimony of the Crosses' expert, Dr. Stephen Manlove, which was allowed by the trial court. Dr. Manlove relied upon the principles of forensic psychiatry to determine Dokken was mentally competent to execute a will. On January 5, 1998, the Eighth Judicial Circuit, Lawrence County, ordered admission of Dokken's will to formal probate.

[¶ 9.] Thomas appeals the trial court's decision, raising the following issues for our consideration:

1. Was the trial court clearly erroneous in finding Thomas failed in his burden of proof to establish Dokken lacked testamentary capacity to execute a will on July 12, 1985.

2. Was the trial court clearly erroneous in finding Thomas failed in his burden of proof to establish Dokken was unduly influenced in executing his will dated July 12, 1985.

3. Did the trial court abuse its discretion in admitting the expert testimony of Dr. Stephen Manlove.

## STANDARD OF REVIEW[2]

[¶ 10.] We review a trial court's findings as to testamentary capacity under the clearly erroneous standard. *Matter of Estate of Long*, 1998 SD 15, ¶ 9, 575 N.W.2d 254, 255 (citing *In re Guardianship and Conservatorship of Lanning*, 1997 SD 81, ¶ 9, 565 N.W.2d 794, 795). Likewise, the issue of whether undue influence exists is a question of fact for the trial court to determine. *Matter of Estate of Unke*, 1998 SD 94, ¶ 11, 583 N.W.2d 145, 147–48 (citing *In re Estate of Madsen*, 535 N.W.2d 888, 891 (S.D.1995)). In *Unke*, we stated:

We will not set aside a trial court's findings of fact unless they are clearly erroneous. *In re Estate of Elliott*, 537 N.W.2d 660, 662 (S.D.1995) (citing SDCL 15-6-52(a); *In re Estate of Till*, 458 N.W.2d 521, 523 (S.D.1990); *In re Estate of Weickum*, 317 N.W.2d 142, 145 (S.D.1982); *In re Estate of Hobelsberger*, 85 S.D. 282, 289, 181 N.W.2d 455, 458 (1970)). A trial court's finding is clearly erroneous if, "after reviewing the entire evidence, we are left with the

---

1. Last Will and Testament of Gilbert Dokken: ARTICLE III.
RESIDUARY ESTATE:
   I give, devise and bequeath my entire estate to my sister, Myrtle Cross if she survives me, otherwise to her children in equal shares. I realize I have other relatives but to them I leave nothing.

2. It is undisputed all attorney-client discussions between Dokken and McIntee, drafting and execution of the will occurred in North Dakota rather than South Dakota. Yet throughout this proceeding both proponent and contestant have relied upon South Dakota statutes and case law. The trial court decided the case pursuant to South Dakota law. As the issue of conflict of laws is not before us we do not address it. However, it appears North Dakota follows basically the same standards for determining testamentary capacity. *See Matter of Estate of Stanton*, 472 N.W.2d 741 (N.D.1991) and *Matter of Estate of Aune*, 478 N.W.2d 561 (N.D.1991). North Dakota also follows the same standards for determining undue influence. *See Matter of Estate of Otto*, 494 N.W.2d 169 (N.D.1992) and *Perry v. Reinke*, 570 N.W.2d 224 (N.D. 1997).

definite and firm conviction that a mistake has been made[.]" *Id.* (citations omitted). All conflicts in the evidence must be resolved in favor of the trial court's determinations. *Till,* 458 N.W.2d at 523. "The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we give due regard to the trial court's opportunity to observe the witnesses and the evidence." *Elliott,* 537 N.W.2d at 662. We review any documentary or deposition evidence under a de novo standard of review. *Id.*

*Id.* "That this Court may have found the facts differently had we heard the testimony is no warrant for us to substitute our judgment for the trial court's carefully considered findings." *Long,* 1998 SD 15, ¶ 9, 575 N.W.2d at 256 (quoting *Lanning,* 1997 SD 81, ¶ 9, 565 N.W.2d at 796).

[¶ 11.] In *State v. Edelman,* 1999 SD 52, ¶ 4, 593 N.W.2d 419, 421, we stated:

> Expert testimony admissibility is governed by SDCL 19–15–2 (Rule 702). It is well settled that the trial court has broad discretion in regard to the admission of expert testimony. *State v. Bachman,* 446 N.W.2d 271 (S.D.1989); *United States v. Purham,* 725 F.2d 450 (8 thCir1984). Absent a clear showing of abuse of discretion, the trial court's decision will not be reversed. *State v. Logue,* 372 N.W.2d 151 (S.D.1985).

## ANALYSIS AND DECISION

[¶ 12.] **1. Was the trial court clearly erroneous in finding Thomas failed in his burden of proof to establish Dokken lacked testamentary capacity to execute a will on July 12, 1985.**

[¶ 13.] SDCL 29A–2–501 provides: "[a]n individual eighteen or more years of age who is of sound mind may make a will." Sound mind, for purposes of testamentary capacity, has been defined as:

> One has a sound mind, for the purposes of making a will, if, *without prompting,* he is able 'to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property.' *In re Estate of Podgursky,* 271 N.W.2d 52, 55 (S.D.1978). Soundness of mind, for the purposes of executing a will, does not mean 'that degree of intellectual vigor which one has in youth or that is usually enjoyed by one in perfect health.' *Petterson v. Imbsen,* 46 S.D. 540, 546, 194 N.W. 842, 844 (1923). Mere physical weakness is not determinative of the soundness of mind, *In re Estate of Anders,* 88 S.D. 631, 636, 226 N.W.2d 170, 173 (1975); and it is not necessary that a person desiring to make a will ' should have sufficient capacity to make contracts and do business generally nor to engage in complex and intricate business matters.' *Petterson,* 46 S.D. at 546, 194 N.W. at 844.

*Long,* 575 N.W.2d at 257–58 (emphasis in original) (other citations omitted).

[¶ 14.] The fact a guardian has been appointed to take care of a testator's estate does not, by itself, invalidate a will because of lack of testamentary capacity. *Id.* at 258 (citing *In re Estate of Hastings,* 347 N.W.2d 347, 350 (S.D.1984)). In addition, "the fact that a testator is ill or suffering from a disease does not necessarily prevent that testator from possessing testamentary capacity." *Id.* (citing *In re Estate of Linnell,* 388 N.W.2d 881, 884 (S.D.1986)). The testator may lack mental capacity to such an extent that according to medical science he is not of sound mind and memory, and nevertheless retain the mental capacity to execute a will. *Podgursky,* 271 N.W.2d at 57 (citing *Keely v. Moore,* 196 U.S. 38, 25 S.Ct. 169, 49 L.Ed. 376 (1904)). "Testamentary capacity is not determined by any single moment in time, but must be considered as to the condition of the testator's mind a reasonable length of time before and after the will is execut-

ed." *Long,* 575 N.W.2d at 258 (citing *Lanning,* 1997 SD 81, ¶ 11, 565 N.W.2d at 796 (citing *In re Estate of Nelson,* 330 N.W.2d 151, 155 (S.D.1983))).

[¶ 15.] Thomas claims Dokken could not talk about his estate, heirs and the disposition of his estate "without prompting." [3] Thomas points to the testimony of Robert Bender, a VA social worker who began visiting and evaluating Dokken in March 1978. Bender testified that when prompted about a fact such as "your sister is Myrtle Cross," Dokken would agree. Thomas also points to the testimony of Michael McIntee, the son of the attorney who drafted Dokken's will on July 12, 1985.[4] Michael testified his father would always sit alone with the testator and go over questions as to his heirs, property, etc. Michael further testified his father would write this information down on a yellow legal pad and keep it with the office copy of the will. Thomas claims an examination of the information McIntee wrote on his yellow pad clearly shows Dokken was either prompted with all of the answers to the questions posed by McIntee or that the information was provided by Kenneth.

[¶ 16.] Thomas contends at one point, Dokken doubted Myrtle was his sister, but McIntee's notes indicated she was the only relative Dokken named. Moreover, Thomas points to the fact at another time Dokken thought his deceased brother, Nels Dokken, was still alive and living in Towner, North Dakota. Thomas asserts that while the McIntee notes indicate Dokken wanted everything to go to Myrtle or to her children if she did not survive, there is no evidence Dokken ever knew Myrtle had children, much less knew their names.

[¶ 17.] Finally, Thomas claims Dokken would have had no idea of the name of the bank and its address where his will would be kept. McIntee's notes indicate the will would be kept in a safe deposit box at Rainier Bank, Williams Street and George Washington Way, Richland, Washington 99352. Thomas contends the only person with this information was Kenneth. Thomas argues this point alone is clear evidence of the fact Dokken was either "prompted" with the information for his will or that Kenneth was in the room with McIntee and Dokken during the execution of the will.

[¶ 18.] We find Thomas' argument that Dokken was prompted into executing his will is without merit. McIntee was a logical choice by Dokken to draft the will. McIntee was the long time family attorney who had handled at least two estates of Dokken's brothers. In addition, McIntee had been the attorney in the VA guardianship of Dokken in North Dakota prior to its being terminated in 1982 due to Melvin Dokken's death and subsequently being re-established in South Dakota.

[¶ 19.] The depositions of Gloria Coyne and Michael, the two attesting witnesses to the execution of Dokken's July 12, 1985 will, tend to refute Thomas' allegations. Their lack of specific memory as to anything being amiss concerning Dokken's execution and their attestation of the will points to a normal execution process, not one out of the ordinary where they were being asked to witness a will of a person not competent to execute it.[5] Michael testified to the procedures his father used in preparation of a will, and explained his father would have noted if another person was present in the room. Michael further testified it was common for aged clients to bring documentary evidence with them to

---

3. As Thomas does not recall ever meeting Dokken and did not produce live witnesses who did, his case is a cross-examination of the proponent's witnesses together with documentary evidence, much of it from the Veteran's Administration.

4. McIntee died in 1988.

5. Both would recognize the significance of the matter of testamentary capacity. At the time of the will's execution, McIntee was a licensed attorney and Coyne was a legal secretary with sixteen years experience.

specify such information as social security numbers, places and amount of financial accounts and land descriptions. The ultimate storage location of a will is not an essential element of testamentary capacity. Either McIntee or Dokken could have exited the interview room and obtained this information from Kenneth whom as Dokken's guardian, was the logical person to hold the will. Per his office policy, McIntee retained a copy of the will and stapled it to his interview notes with Dokken.

[¶ 20.] Thomas also argues Dokken lacked testamentary capacity to execute his will because the VA classified him as being "incompetent for VA purposes." This classification was based in part on the fact Dokken had been diagnosed with schizophrenia. From the late 1970's to the date of his death, VA social workers visited with Dokken and made yearly field examinations of his mental and financial status. From 1982 to 1997, the VA Field Examination Reports consistently state Dokken did not have the ability to handle his own financial affairs. The VA Field Examination Report dated April 7, 1983 states:

> The veteran understood that he has a guardian who handles his funds. He had no knowledge of his actual income and estate and indicated that it was satisfactory with him that Kenneth Cross handle his financial affairs. The veteran showed no emotion when I informed him that he had an estate of approximately $150,000.... The veteran does not seem to have any understanding as to the actual value of the dollar and probably functions out of the pattern and habit with the limited amount of money given him at this time.

[¶ 21.] Although Dokken was found incompetent for VA purposes, this does not mean he was lacking in testamentary capacity. At trial, Dr. Manlove explained the differences between the two competency standards:

> To be competent for VA purposes, one has to be able to manage his or her own affairs, including disbursement of funds without limitations. For testamentary competence, one needs to know the extent of their estate and assets and the natural heir of their money. They don't need to be able to manage it, they don't need to be able to disburse their funds without limitations.

Dr. Manlove also testified, from a medical standpoint, a person could be deemed incompetent for medical or for VA purposes, but still be competent to make and execute a will. A testator may lack mental capacity according to a medical standard, but still retain the mental soundness to execute a will. *Podgursky*, 271 N.W.2d at 57 (other citations omitted). Moreover, in *Podgursky*, we held a trial court's finding was not "clearly erroneous" that a testator, who had previously been determined incompetent for VA purposes, had testamentary capacity to make a will. *Podgursky*, 271 N.W.2d at 58.

[¶ 22.] While we note several VA field examiners who made brief annual visits to Dokken stated Dokken did not have the ability to understand his income, estate and expenses, the Crosses produced countering evidence to the trial court. Hyde testified Dokken knew he had an estate, but may not have known its exact value. Hyde also testified Dokken was aware Kenneth was his guardian who took care of his financial affairs. Dokken and other veterans spoke about their estates amongst themselves. Dokken may have become interested in making a will after a conversation with the other veterans on the subject. Hyde also testified Dokken was conservative and did not have problems managing his money.[6] Finally, the Hydes were also confident Dokken knew who his relatives were. Dokken knew his sister Myrtle; in fact, Mr. Hyde testified Dokken called her "Myrt."

6. At trial, Mr. Hyde gave the example of when the veterans would go out to eat, some would order the biggest, most expensive steak, but Dokken would usually have chicken because it was cheaper.

[¶ 23.] Bender testified that based on his knowledge and understanding of Dokken, he believed Dokken knew who his relatives were, and had the ability to understand he had an estate.[7] Bender also testified that while it was difficult at times to converse with Dokken because he was not one to do a lot of conversing, he would always responsively answer Bender's questions. Dokken's answers were logical and he was very rational during his conversations with Bender.

[¶ 24.] Moreover, the trial court determined the professional opinion and testimony of Dr. Manlove supported the conclusion Dokken was competent on July 12, 1985 to make and execute a will. Dr. Manlove testified that based on his evaluation of the records and interviews with individuals who knew Dokken personally, his professional opinion to a reasonable degree of medical certainty was that Dokken possessed the abilities consistent with testamentary capacity at the time he executed his will. Dr. Manlove concluded Dokken had not suffered from psychotic symptoms during the years of 1978–1990. Dr. Manlove testified that during these years, Dokken suffered from the negative symptoms of schizophrenia.During his testimony, Dr. Manlove explained schizophrenics who display negative symptoms tend to become isolated and have a difficult time maintaining interpersonal relationships. Therefore, due to schizophrenia, Dokken was not able to open up to unfamiliar people and would be reluctant to share information about himself. Dr. Manlove testified it appeared the value of his estate was not of great concern to Dokken. The Crosses claim Dokken's failure to keep exact track of the value of his estate should not be interpreted as an inability to understand the value. We agree. Many persons of normal intelligence who possess more than minimal assets would be hard pressed to give an exact statement of their wealth if asked to do so without some background research. Although the VA field examiners gave negative reports of Dokken during their visits, the Hydes, Bender and Dr. Manlove all testified that Dokken's personality would explain the negative reports. The VA field examiners only visited Dokken once a year and the visits were brief, approximately 15 to 20 minutes long.

■ [¶ 25.] In this case, we recognize some of the evidence as to Dokken's testamentary capacity is contradictory. However, it was for the trial court to select, from the conflicting evidence, that which it believed to be true. *Podgursky*, 271 N.W.2d at 56; *Estate of Williams*, 88 S.D. 55, 215 N.W.2d 489, 490 (1974). It, not this Court, is the trier of the facts. *Podgursky*, 271 N.W.2d at 56.

It is also well-settled that the credibility of witnesses and weight of evidence is for the trial court and that a reviewing court accepts that version of the evidence, including the inferences that can be fairly drawn therefrom, which is favorable to the trial court's determination.

*Id.* (citing *Nicolaus v. Deming*, 81 S.D. 626, 139 N.W.2d 875 (1966); *Schmidt v. Earl*, 83 S.D. 245, 158 N.W.2d 184 (1968); *Larson v. Syverson*, 84 S.D. 31, 166 N.W.2d 424 (1969)). "Contestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation." SDCL 29A–3–407. There was sufficient evidence to justify the trial court's decision finding Dokken possessed testamentary capacity to execute his will. The trial court's decision was not clearly erroneous.[8]

---

7. Bender received a Master's Degree in social work in 1956, and he was a clinical social worker for the VA Hospital in Fort Meade. On the average he saw Dokken monthly.

8. It appears the dissent has abandoned this most deferential standard of review for a selective sifting of the facts, some of which are not even supported by the record. In the dissent there is not a single sentence acknowledging this standard of review upon which

**[¶ 26.] 2. Was the trial court clearly erroneous in finding Thomas failed in his burden of proof to establish Dokken was unduly influenced in executing his will dated July 12, 1985.**

[¶ 27.] Under our settled law, to establish the existence of undue influence a will contestant must prove four elements by a preponderance of the evidence:"(1) decedent's susceptibility to undue influence; (2) opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and (4) a result clearly showing the effects of undue influence." *Unke*, 1998 SD 94, ¶ 12, 583 N.W.2d at 148 (citing *Elliott*, 537 N.W.2d at 662–63).

[¶ 28.] A presumption of undue influence arises "when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the will and unduly profits therefrom." *Id.* ¶ 13 (quoting *Madsen*, 535 N.W.2d at 892). When this presumption arises, the burden shifts to the beneficiary to show he took no unfair advantage of the decedent. *Id.* (citing *In re Estate of Metz*, 78 S.D. 212, 222, 100 N.W.2d 393, 398 (1960)). However, the ultimate burden remains on the contestant to prove the elements of undue influence by a preponderance of the evidence. *Id.* (citing *Madsen*, 535 N.W.2d at 893). We recently clarified the undue influence test in *Unke* by stating: *"the burden of going forward with the evidence in an undue influence case does not shift to the*

the entire issue hinges. Rather, it devotes its entire discussion to an attempted justification to reverse the trial court.

The dissent quotes Michaela Hyde as testifying that she "agreed that Dokken had 'no understanding of his income, estate and expenses.'" She never testified in that manner. What she really said was:

> Q: On the economic section, it says, "Gilbert has no understanding of his income, estate and expenses." Would that correspond with your recollection at that time?
> A: That is possible. We didn't talk to him about any income or estates or any of his expenses other than his allowance.

The dissent cites dated VA documents for the proposition that Dokken "seemed to be unsure of actually who [his] guardian [wa]s." The author of that statement was never called as a witness and thus was not subject to cross–examination. In contrast, Michaela Hyde who cared for Dokken for years did testify live and was thoroughly cross-examined:

> Q: Did Gilbert know who his guardian was?
> A: Yes he did.

Michaela's husband Douglas Hyde testified:

> Q: And did he know that Kenneth was his guardian?
> A: Yes, uh-hmm. He knew.

Robert Bender, a VA social worker who saw Dokken regularly testified:

> Q: Could he give you the name of his guardian?
> . . . .
> A: Yes.

Contrary to the VA document's claim that Dokken could not provide his own date of birth, Michaela Hyde testified:

> A: With maybe the [VA] field examiner, just because he only came once a year, so he'd be more like a stranger to [Dokken]. [Dokken] would discuss these things with the other veterans.

Although the dissent claims Dokken saw snakes coming out of the walls, Robert Bender testified:

> Q: Was there any occasions where he saw snakes on the wall, or holes in the wall, or that type of thing?
> A: Not while the Hydes were there, no.

It is not surprising that the trial court chose to believe the live testimony of witnesses who cared for Gilbert Dokken on a daily basis for years over that of stale government records. Further, the Hydes and Robert Bender had no financial or other interest in the outcome of the case which is not always the situation in a will contest. Michaela Hyde explained the value of the government records was minimal because the field examiner "came once a year, so he'd be more like a stranger to [Dokken]." Douglas Hyde testified "[Dokken] wouldn't talk with [the VA field examiners] hardly at all." Robert Bender agreed, noting it would be difficult for the field examiner to "get responses and answers from [Dokken]."

The trial court recognized the minimal value of these government documents when they were used to attempt to cross-examine live witnesses. It observed, "I think we should ask the person who wrote the note." Of course that was impossible since the authors were never produced by the contestant.

*beneficiary unless a presumption of undue influence is established." Id.* (emphasis in original).

[¶ 29.] Thomas claims there is evidence of undue influence in a March 3, 1986 letter to the VA. In this letter, Kenneth wrote of his wife's cancer surgery in 1985 and the extreme expense involved. After four years as guardian, Kenneth wrote in the letter he was going to recoup expenses for being Dokken's guardian. Kenneth explained it was too expensive for him to make annual trips to South Dakota from the State of Washington to visit Dokken and that he had tried in vain to convince Dokken to move to Washington. Thomas points to the fact that Kenneth wrote, "Last year we were able to get him to agree to a 3 day trip to Towner [North Dakota]." Thomas argues this language is evidence Dokken was prompted or influenced into going to Towner to execute his will. Thomas also claims there is evidence of undue influence in the way the will was handled after it was executed. The will was not given to Dokken for safekeeping or to the Lawrence County Clerk of Courts, but to Kenneth who deposited it in his bank in Richland, Washington. Thomas claims Kenneth kept Dokken's will even after his resignation of his guardianship in 1988.[9]

[¶ 30.] In determining a presumption of undue influence had not arisen, the trial court first looked to whether a confidential relationship existed between Dokken and the Crosses. "A confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another." *Id.* ¶ 16 (citing *Madsen*, 535 N.W.2d at 892). In determining whether a confidential relationship exists, this Court considers such factors as the "amount of time the beneficiary spent with the testator, whether the beneficiary handled many of the personal or business affairs of the testator, and whether the testator ever sought the advice of the beneficiary." *Id.* (citing *Till*, 458 N.W.2d at 524). The court found some evidence of a confidential relationship, because Kenneth Cross was Dokken's legal guardian and Myrtle was Kenneth's wife. The trial court also noted the Crosses managed Dokken's money during the time he executed his will.

[¶ 31.] However, the trial court found that other than transporting Dokken to North Dakota, there was no evidence either Mr. or Mrs. Cross participated in the preparation or execution of the will. Other than Thomas, Myrtle was Dokken's only living relative. Furthermore, the trial court found "it is only logical he would leave his estate to her rather than those he hardly knew and never saw. Thomas could not remember if he ever met Gilbert."

[¶ 32.] The trial court found the evidence in this case showed Dokken was not susceptible to undue influence, and we agree. Hyde testified Dokken controlled his monthly allowance given to him by the foster home and was also conservative in his spending. Hyde also testified that Dokken understood the concept of money and finances.

[¶ 33.] The Crosses only saw Dokken once a year and would call or write an additional two or three times a year. Kenneth's claim to the VA for guardianship fees he had previously not sought is no more than any guardian was entitled to under South Dakota law for his services. We agree with the trial court's findings of fact contained in its memorandum opinion:

> There is scant evidence of any opportunity by Crosses to exert undue influence on Gilbert. They lived over a thousand miles away, visited him annually, and called or wrote occasionally. The trip to North Dakota was Gilbert's idea. When Hyde passed this request along to [Ken-

---

**9.** In 1988, the VA determined Kenneth was not able to "properly fulfill his duties and responsibilities as a guardian for Dokken." The VA gave Kenneth the opportunity to re-sign in favoring of appointing a bank in South Dakota. Kenneth then signed a letter of resignation.

neth], [Kenneth] waited until summer to make the trip. This is not the behavior of a person seeking unfair advantage or attempting to improperly influence the Testator.

[¶ 34.] We find there is a lack of evidence in the record the Crosses were predisposed to exert undue influence over Dokken.[10] The Crosses never tried to influence Dokken in how he spent his money, and told the Hydes to give Dokken whatever money he wanted. The guardianship accounts were annually reviewed by the VA and approved by the circuit court. "[I]n order for undue influence to exist, the influence 'must be such as to destroy the free agency of the testator and substitute the will of the person exercising it for that of the testator.'" *Till*, 458 N.W.2d at 528 (quoting *In re Estate of Blake*, 81 S.D. 391, 398, 136 N.W.2d 242, 246 (S.D.1965)). Because the trial court was not clearly erroneous in finding Thomas failed to establish a presumption of undue influence, or in finding Thomas failed in his burden of establishing two of the elements necessary for a finding of undue influence, we need not address the issue any further.

[¶ 35.] **3. Whether the trial court abused its discretion in admitting the expert testimony of Dr. Stephen Manlove.**

[¶ 36.] Thomas contends Dr. Manlove's testimony was inadmissible. At trial Thomas objected to the testimony based on, among others, the grounds of foundation and Dr. Manlove's testimony was not scientifically proven as being an area of his expertise. Thomas obtained from the trial court a continuing objection to Dr. Manlove's testimony and made a written motion to strike before resting his case.

[¶ 37.] Dr. Manlove testified at trial the techniques he used to reach his conclusion Dokken possessed testamentary capacity were consistent with techniques accepted by the American Association of Psychiatry and the Law. Dr. Manlove has been certified in forensic psychology by the American Association of Psychiatry and the Law and the American Psychiatric Association. He has attended classes conducted by the American Board of Psychiatry, including classes which instruct doctors on the proper and acceptable procedures to use in preparing an opinion in testamentary capacity cases. Dr. Manlove testified forensic psychiatry involves the interaction of psychology and the law. He explained it includes working with people in legal situations and testifying regarding psychological issues. Forensic psychiatry is legally defined as "that branch of medicine dealing with disorders of the mind in relation to legal principles and cases." BLACK'S LAW DICTIONARY 449 (6th ed 1990).[11]

[¶ 38.] Dr. Manlove's testimony relied for its foundation upon interviews with

---

10. Evidence of the lack of undue influence the Crosses had in their relationship with Dokken is clearly shown by a letter written on March 3, 1986 by Kenneth to the VA. In part it states:

> With the expense of [Myrtle's] surgery and the following treatments it has become necessary for me to recover the costs of three trips to Dakota in the past four years. Originally I hoped I could get Gilbert [Dokken] to move near the veterans hospital in Walla Walla [Washington]. Trips to Spearfish have shown me this is the only place he considers home and is where his only friends are.

This letter was written only eight months after the Crosses last visited Dokken which included the trip to Towner to execute the will. If on that trip Crosses were again· unable to influence Dokken to relocate to Washington, it is difficult to accept the argument of Thomas that on the same trip Crosses were able to convince Dokken to leave them all his assets.

11. Forensic psychiatry is a subspecialty of psychiatry, which itself is a subspecialty of medicine. Michael K. Spodak, ABA *The Psychiatrist as Witness*, 27–SUM Brief 64 (Summer 1998). Psychiatry is defined as the medical science that deals with the origin, diagnosis, prevention, and treatment of mental disorders. *Id.* A psychiatrist is a physician whose training includes a medical degree and four or more years of post-medical school training, usually including an internship and at least three years of residency training in psychiatry. *Id.* Following the completion of residency training in psychia-

Michaela Hyde and Robert Bender,[12] reviewed field examiners' reports from 1983–1990, the Contestant's Answers to Proponents' Interrogatory to Contestant dated July 1998 and the medical records of Dokken from 1978–1990. Thomas argues Dr. Manlove's testimony did not establish his forensic psychiatry "rests on a reliable foundation and relevant to the task at hand" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469, 480 (1993). Thomas also argues Dr. Manlove's testimony goes to an ultimate fact of the case, i.e., whether Dokken possessed testamentary capacity to execute a will, and is thus an issue for the trial court to determine. However, SDCL 19–15–4 (Rule 704) allows Dr. Manlove's testimony as to the issue of testamentary capacity. SDCL 19–15–4 provides: "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

[¶ 39.] Furthermore, "[t]he trial court's evidentiary rulings are presumed correct and will not be reversed unless there is a clear abuse of discretion." *Stormo v. Strong,* 469 N.W.2d 816, 820 (S.D. 1991) (quoting *Zepp v. Hofmann,* 444 N.W.2d 28, 31 (S.D.1989)). Trial courts have broad discretion concerning the admission of expert testimony. *State v. Moeller,* 1996 SD 60, ¶ 87, 548 N.W.2d 465, 485 (citing *State v. Hill,* 463 N.W.2d 674, 676 (S.D.1990)).

[¶ 40.] In South Dakota, SDCL 19–15–2 governs the admissibility of scientific expert testimony. SDCL 19–15–2 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This is the test set forth in the *Daubert* case which was adopted by this Court in *State v. Hofer,* 512 N.W.2d 482 (S.D.1994). After the adoption of the *Daubert* test, general acceptance in the scientific community is no longer required. *Moeller,* 1996 SD 60, ¶ 52, 548 N.W.2d at 479. The trial judge must simply determine "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* Pertinent evidence based on scientifically valid principles will satisfy those demands. *Id.* (citing *Hofer,* 512 N.W.2d at 484) (citing *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485).

[¶ 41.] We conclude Thomas' objections are without merit. Thomas argues Dr. Manlove's testimony hinges on the fact that at the time Dokken executed his will, he did not suffer from psychotic episodes. Thomas claims this testimony is inconsistent with Mr. Bender's testimony that during the time period in which Dokken executed his will, he was talking to

---

try, the psychiatrist may receive additional certification in forensic psychiatry. *Id.* In recent years, the American Board of Psychiatry and Neurology has established a subspecialty examination in forensic psychiatry. *Id.* If a physician satisfactorily completes that examination, he or she is then designated with additional certification in forensic psychiatry. *Id.* "[I]n the mental health field, forensic psychiatry is a well-established subspecialty with well-trained individuals experienced in the evaluation of litigants, knowledgeable about the interface between law and mental health, and often skilled in presenting information effectively." *Id.*

12. Thomas also objected to Dr. Manlove's reliance on his interviews with the Hydes and Bender as inadmissible hearsay. However, we have previously stated an expert may rely on interviews with family members, witnesses, officers and other medical professionals. *State v. Gallegos,* 316 N.W.2d 634, 637 (S.D.1982). Moreover, in *Daubert* the Supreme Court stated: "[u]nlike an ordinary witness, ... an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation." *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.

trees.[13] Thomas' objections go to the weight of the evidence rather than the admissibility of Dr. Manlove's testimony. The "extent to which the facts are inconsistent with the expert's opinions affect only the weight to be given to the opinions, not their admissibility." *Marnette v. Morgan,* 485 N.W.2d 595, 600 (S.D.1992) (Amundson, J. dissenting) (quoting *Grote v. Estate of Franklin,* 214 Ill.App.3d 261, 157 Ill.Dec. 942, 573 N.E.2d 360 (1991)). "The basis of an expert's opinion is generally a matter going to the weight of the testimony rather than the admissibility." *State v. Spiry,* 1996 SD 14, ¶ 16, 543 N.W.2d 260, 264 (citing *Johnson v. Schmitt,* 309 N.W.2d 838 (S.D.1981) (other citations omitted)); *see also People v. Danielson,* 3 Cal.4th 691, 13 Cal.Rptr.2d 1, 838 P.2d 729, 751 (1992) (noting criticism of opinions of forensic psychiatrist goes to the weight of those opinions rather than their admissibility).

[¶ 42.] Courts have allowed forensic psychiatrists to testify as to the mental capacity of an individual. In some will contest cases medical testimony – usually that of a psychiatrist – is used to help determine a testator's capacity. Note, *Psychiatric Assistance in the Determination of Testamentary Capacity,* Harv L Rev 1116 (April 1953). In *Estate of Dankbar v. Christianson,* 430 N.W.2d 124 (Iowa 1988), a forensic psychiatrist testified as to whether a schizophrenic decedent had possessed testamentary capacity to create a will. The will contestant's evidence of the decedent's testamentary incapacity centered on the testimony of the forensic psychiatrist, Dr. Varner.[14] *Id.* at 129. The court noted the doctor had offered a number of opinions crucial to the contestant's proof of the decedent's incapacity, and held the psychiatrist's testimony alone generated a jury question as to testamentary capacity. *Id.* See also *Succession of Hamiter,* 519 So.2d 341 (La.Ct.App. 2 Cir. 1988) (noting psychiatrist with training in forensic psychiatry testified as to the issue of the decedent's testamentary capacity).

[¶ 43.] We agree with this reasoning, and believe the trial court in this case weighed the credibility of all witnesses at trial, including that of Dr. Manlove. Thomas certainly could have called his own psychiatrist to counter Dr. Manlove's testimony. The trial court offered him that opportunity but he chose not to do so.

[¶ 44.] We find the trial court did not abuse its discretion when it admitted Dr. Manlove's testimony as to Dokken's testamentary capacity. The Crosses established there was an adequate evidentiary basis for Dr. Manlove's testimony; thus, it was up to the trial court to determine the weight to be given to Dr. Manlove's opinion.

[¶ 45.] Affirmed.

[¶ 46.] MILLER, Chief Justice and KONENKAMP, Justice, concur.

[¶ 47.] AMUNDSON, Justice, concurs specially.

[¶ 48.] SABERS, Justice, dissents.

AMUNDSON, Justice (concurring specially).

[¶ 49.] I concur on all issues, except issue three with which I concur specially.

---

13. Robert Bender testified Dokken's psychotic episodes involved beating on and talking to apple trees and the disposal of his clothing in the garbage. However, Bender further explained the tree incidents only happened every two or three months when Dokken failed to take his regular medication. Apparently one of Dokken's few luxuries in life was that he liked to dress well and choose his own clothes. When he tired of his clothes or wanted to go shopping for new ones, he attempted to force the issue by throwing some of his clothing in the trash.

14. The proponents of the will objected to the psychiatrist's testimony, arguing it was based in large part on the hearsay statements and opinions of others. *Id.* Dr. Varner reviewed extensive data concerning the decedent's family and medical history, and his sources of information included interviews with family members, medical records and attending physicians. *Id.* This is similar to the objection made in the case before us.

**[¶ 50.] 3. Whether the trial court abused its discretion in admitting the expert testimony of Dr. Stephen Manlove.**

[¶ 51.] Based upon this record, the trial court did not abuse its discretion in allowing Dr. Manlove's testimony. This record does not contain any hearing where this type of forensic evidence was tested under *Daubert* principles. All that was done was the making of a generic objection based upon foundation during trial which was next made into a continuing objection; whatever that is. During oral arguments counsel for Thomas stated that, for financial reasons, no expert was hired to contest or challenge Manlove's opinions. In addition, Thomas was not provided with a copy of Manlove's proposed opinion until the "midnight hour" or just prior to trial. The Eighth Circuit, when discussing admissibility of an expert's testimony under *Daubert,* stated:

> When evaluating the admissibility of expert testimony under Federal Rule of Evidence 702, the district court must look to both the relevancy and the reliability of the testimony. [citations omitted]. This gate-keeping function is applicable to " 'technical' and other 'specialized' " expert testimony, in addition to the testimony of scientific experts.

*Blue Dane Simmental Corp. v. American Simmental Assoc.,* 178 F.3d 1035, 1040 (8thCir.1999) (quoting *Kumho Tire Co. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238, 249 (1999) (quoting Fed.R.Evid. 702)). Is the mere fact that an individual has credentials sufficient to allow testimony of any subjective opinion? In *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 424 (5thCir.1987), the court said no. In *Viterbo,* the Fifth Circuit Court of Appeals stated that "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Id.*

[¶ 52.] Whether the use of forensic psychiatry to prove testamentary capacity should receive a "rubber stamp of approval" is not supported by this record. There is not enough contained in this record for a meaningful appellate review of whether the methodology used by this witness is reliable because Thomas could not afford to challenge it. Under the gatekeeping duties of the trial court, we must always remember that the reasoning or methodology of experts should be first tested for their scientific validity and then whether that reasoning or methodology is properly applicable to the facts at hand. This has not been done in this case, but it is not the fault of the trial court. Based upon the above, I would submit that this opinion should not be taken as a *carte blanche* admission of forensic psychiatry testimony in all future testamentary capacity disputes.

SABERS, Justice (dissenting).

[¶ 53.] We have stated: "[t]estamentary capacity cannot be determined based on a single moment in time, but rather is based on consideration of the condition of the testator's mind a reasonable length of time before and after the making of the will." *In re Lanning,* 1997 SD 81, ¶ 11, 565 N.W.2d 794, 796 (citing *In re Estate of Nelson,* 330 N.W.2d 151, 155 (S.D.1983)). The following cumulative facts show that when Dokken executed his will on July 12, 1985, he did not have the requisite testamentary capacity.

[¶ 54.] The trial court received various VA documents into evidence, without objection from the proponent. In fact, some by stipulation. The trial court reviewed the field examinations and referred to them in the findings of fact, albeit primarily by contradiction.

[¶ 55.] The majority states that the controlling standard of review is limited to determining whether the trial court's decision was clearly erroneous. However, "[u]nder our long-standing rule, when reviewing findings based on documentary evidence we do not apply the clearly errone-

ous rule ..., but review the matter de novo." *First National Bank v. Bank of Lemmon,* 535 N.W.2d 866, 871 (S.D.1995) (Miller, C.J., writing the majority opinion with respect to the issue of the correct standard of review) (citing *Pankratz v. Miller,* 401 N.W.2d 543, 548 (S.D.1987); *In re Investigation of the Highway Construction Industry,* 396 N.W.2d 757, 758 (S.D. 1986); *Leslie v. City of Bonesteel,* 303 N.W.2d 117, 119 (S.D.1981); *Pearson v. Franklin Laboratories,* Inc., 254 N.W.2d 133, 140–41 (S.D.1977); *Ayres v. Junek,* 247 N.W.2d 488, 490 (S.D.1976); *Geo. A. Clark & Son, Inc. v. Nold,* 85 S.D. 468, 185 N.W.2d 677, 680 (S.D.1971), *cert. denied* 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971)).

[¶ 56.] Since 1956, Dokken has been diagnosed with schizophrenia, paranoid type. The VA immediately determined him to be incompetent under its standards:

> A mentally incompetent person is one who because of injury or disease lacks the mental capacity to contract or manage his or her own affairs, including disbursements of funds without limitation.

[¶ 57.] The VA then conducted annual field examinations to evaluate Dokken's competency. There were three categories that were evaluated by the examiner: (1) Description and Health; (2) Social and Economic Adjustments; and (3) Allowances. Beyond Dokken's financial position, the VA was concerned about the care Dokken was receiving, how he was adjusting to his environment and whether his needs were being met.

[¶ 58.] A field examination, dated March 30, 1983, revealed that Dokken "had no knowledge of his actual income and estate." The report further stated Dokken did not "seem to have any understanding as to the actual value of the dollar."

[¶ 59.] On April 11, 1984, the field examiner, Mr. Russell L. Lofswold, noted that Dokken "seemed to be unsure of actually who [his] guardian [wa]s." It further noted Dokken had "virtually no understanding of his actual income, estate, and expenses."

[¶ 60.] On April 2, 1985, Lofswold again stated in his field examination report that Dokken had "no understanding of his income, estate and expenses." Furthermore, he could not provide his own date of birth or the name of his guardian of three years, Kenneth Cross.[15]

[¶ 61.] On April 9, 1986, the report was unchanged: Dokken "obviously ha[d] virtually no understanding of his income, estate and expenses."

[¶ 62.] The record also discloses other situations that give reason for concern. On April 22, 1991, Dokken was seen by a doctor for "inappropriate self-destructive behavior." In November of 1992, Robert Bender documented that Dokken claimed to have seen snakes coming out of the walls in his residential care home:

> Mr. Dokken was visited by this worker on 6/29/92, 7/21, 8/6 and 9/16/92. When I visited the veteran in June[,] Mr. and Mrs. Rost told me that the veterans' Thorazene had been reduced, he had become psychotic and it was necessary to increase the medication. At that time[,] the veteran was seeing snakes coming out of the walls and was going out into the yard from tree to tree,

---

15. The trial court made specific findings regarding Lofswold's field examination:

> 35. Russell L. Lofswold was a field examiner who visited with Gilbert Dokken in 1985, a few months before the execution of the Will.
>
> 36. Lofswold noted that Gilbert could not give his correct date of birth or his guardian's name and did not know about his income, estate or expenses. Mr. Lofswold was a stranger to Gilbert and someone he did not want to talk to. Gilbert Dokken even refused to answer some questions.

Based on the fact that Lofswold did not testify, the trial court had to deduce these findings from the VA documents. Thus, the findings are subject to de novo review. *First National Bank,* 535 N.W.2d at 871 (citations omitted).

shaking the tree and branches.... In early September, Mr. Rost called to report that Mr. Dokk[e]n was becoming quite psychotic again, that he was doing a lot of swearing and he was going through everybody's closets. He was also spending a lot of time beating on the trees in the yard and pounding rocks together.

Bender signed this medical record, which appears as proponent's stipulated exhibit 5.

[¶ 63.] On occasion, Dokken also denied that Myrtle Cross was his sister and that his brother, deceased since 1969, was still alive and living in North Dakota. At one point, Dokken stated that he felt the U.S. Treasury was handling his money for him and that he had no idea of the extent of his estate or his investments. Dokken also had stated that the residential care home he lived in was actually a ranger station and that the forest service ran it.

[¶ 64.] In determining whether one has a sound mind for purposes of testamentary capacity, we have stated:

> One has a sound mind, for the purposes of making a will, if, *without prompting,* he is able 'to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property.'

*Lanning,* 1997 SD 81, ¶ 11, 565 N.W.2d at 796 (quoting *In re Estate of Burk,* 468 N.W.2d 407, 409 (S.D.1991) (quoting *In re Estate of Podgursky,* 271 N.W.2d 52, 55 (S.D.1978)) (emphasis added)).[16]

[¶ 65.] I recognize "[t]he fact that a guardian has been appointed to take care of a testator's estate does not, by itself, invalidate a will because of lack of testamentary capacity." *In re Estate of Long,* 1998 SD 15, ¶ 22, 575 N.W.2d 254, 258 (citation omitted). However, as we have previously stated, while the facts that Dokken had a guardian and suffered from schizophrenia are not dispositive of the issue of whether testamentary capacity existed, they are helpful. *Id.* ¶ 24.

[¶ 66.] In viewing the record cumulatively, it is clear that Dokken did not understand the nature and extent of his property at the time he executed his will in 1985. The annual reports, beginning in 1983, *consistently* report that Dokken had no knowledge of the nature and extent of his property. More specifically, the field examination report, issued on April 2, 1985, three months before he executed his will, unequivocally stated that Dokken had "no understanding of his income, estate [or] expenses." [17]

[¶ 67.] Cross-presented evidence of Dokken's residential care provider from 1982 to 1986, Ms. Hyde. Hyde also agreed that Dokken had "no understanding of his income, estate and expenses." She further admitted that neither she nor her husband "talk[ed] to him about any income or es-

16. In one finding of fact, the trial court correctly stated that to establish testamentary capacity, "Dokken needed to comprehend the nature and extent of his property, know who his heirs were and know how he wanted his property disposed of." It appears that the field examination reports alone could have answered the question. But in the next finding of fact, the trial court attempts to justify why it provided little value to the government documents:

> Veterans Administration's filed examiners are not qualified medical workers and they are not required to have medical or psychological training. The Veteran Administration's field examiners work for the administrative office and their job is to determine whether the veteran remains unable to care for their financial affairs.

One does not need to be a medical doctor or a psychologist to make observations regarding testamentary capacity. If that were the case, then "forensic psychiatry" would replace all witnesses in testamentary capacity cases in South Dakota.

17. While the majority considers these government records "stale," they are accurate reflections of observations of the VA employees evaluating Dokken. One could argue that they are more accurate than the live testimony of witnesses trying to recall, in 1998, what transpired in their communications with Dokken in 1983–86.

tates or any of his expenses other than his allowance."

[¶ 68.] Cross also called Dokken's social worker, Robert Bender, who worked with Dokken from 1978 until February of 1985, to testify. During this time period, Bender saw Dokken either monthly or every two months. He initially testified that Dokken had the ability to understand his estate. However, beyond his monthly allowance of $75 – $100, Bender admitted that he never spoke with Dokken about his estate. He also admitted that he never talked to Dokken about Dokken's relatives. On cross-examination, Bender further admitted that Dokken was hard to converse with, but that he did respond to "yes or no" questions:

Q: Why would you say it's difficult to converse with him?

A: Well, probably because he just was not one who liked to do a lot of conversing. But he would answer my questions.

\* \* \*

Q: And generally speaking, if you *prompted* [Dokken] about a fact like, "Is your sister Myrtle Cross," wouldn't he agree with you?

A: Yes.

Q: Okay. He was the type of person who liked to – he didn't want confrontation? He didn't want confrontation, didn't like confrontation?

A: No.

Q: *He would want to tend to get along and be agreeable?*

A: Uh-hmm. *Very much so.*

Clearly, any response to Bender's inquiries would constitute "prompting." He further stated that during the time period of 1982–1986, Dokken had a history of being overtly psychotic at times. For example, Dokken would talk to trees or beat on them 4–6 times a year and occasionally throw his clothes away.

[¶ 69.] Dr. Manlove also testified as to the testamentary capacity of Dokken. Manlove, however, never met Dokken. He based his opinion, in part, on telephone conversations with Hyde and Bender as well as the field examination reports from 1983 to 1990. However, some of the facts he based his opinion on were inconsistent with what was testified to at trial. For example, Manlove's report states that Hyde told him that Dokken "was aware that he had a substantial amount of money and wanted to make a will." At trial, however, he agreed that Dokken had "no understanding of his income, estate and expenses."

[¶ 70.] Dr. Manlove's opinion testimony was properly objected to, was highly questionable, and even if admissible should have little weight.

[¶ 71.] Additionally, the attorney who drafted Dokken's will, predeceased Dokken. The son of said deceased attorney opined as to the attorney's usual procedures, which procedures were, in fact, substantially inconsistent with the attorney's own notes. The attorney's notes, dated July 11, 1985, indicate that Dokken wanted to bequeath an interest in a contract for deed as well as $200,000 in savings to his sister Myrtle Cross. Yet, the parties could not locate a contract for deed in Dokken's name. It is presumed that the contract for deed never existed. Consequently, Dokken did not even know his property or the extent of it.

[¶ 72.] "The proponent of a will has the burden of establishing the testamentary capacity of the testator at the time the will was executed." *Long*, 1998 SD 15, ¶ 26, 575 N.W.2d 254, 258 (citation omitted). Based upon the cumulative evidence, it is evident that Dokken was not able "to comprehend the nature and extent of his property." *Lanning*, 1997 SD 81, ¶ 11, 565 N.W.2d at 796 (quotations omitted). Therefore, Cross did not meet her burden in establishing that Dokken possessed testamentary capacity.

[¶ 73.] Finally, I respectfully submit that the majority is being incredibly "result oriented." If this will had been procured by the nephew and gave everything to him, it would not have a chance to be admitted to probate. Instead, they look the other way because the guardian procured the will for his wife, Dokken's sister.

[¶ 74.] In doing so, we have reduced our standards for competency to make a will to a new low. In fact, *even below* those of the VA. Dokken did not have the "mental capacity to contract or manage his own affairs ...," but this court permits him to dispose of his entire estate to one person. This estate should be distributed by intestate succession, not by a will signed totally without testamentary capacity. Because there was no testamentary capacity, the issue of undue influence need not be reached.

[¶ 75.] I vote to reverse and remand on Issue 1.